**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
DOE (P),                    )
                            )
        Plaintiff,          )
                            )
    v.                      )   Civil Action No.
                            )   04-2122 (GK)
Hon. PORTER GOSS, et al.,   )
                            )
        Defendants.         )
_____)
```

<u>MEMORANDUM OPINION</u>

Plaintiff Doe, a former employee of the Central Intelligence Agency ("CIA"), brings this suit against Porter Goss, Director of the CIA;[1] the CIA; James Pavitt, CIA Deputy Director of Operations ("DDO"); the United States; and two Defendants Doe, whom Plaintiff identifies as current or former agents, officers and employees of the United States acting under color of Federal law.  Plaintiff's true name and address are classified, and therefore he has been allowed to file as "Doe."  Plaintiff brings this action under the Privacy Act, 5 U.S.C. § 552a(g)(1), the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1) & 2(A) - (D), the Little Tucker Act, 28 U.S.C. § 1346(a)(2), and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 et seq.

This matter is before the Court on Defendants' Motion to Dismiss the Second Amended Complaint ("Defs.' Mot.").  Upon

---

[1] The Director of the CIA is sued in his official capacity. Defendant Goss has since been succeeded by General Michael V. Hayden, although the Government has not formally moved to substitute him as a defendant.

consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, the Defendants' Motion to Dismiss is **granted in part** and **denied in part**.

## I.   BACKGROUND

### A.   Factual History[2]

The gravamen of Plaintiff's claims is that he "is being subjected to retaliation by Defendants for his refusal to falsify intelligence collected by him."  Second Amended Complaint ("2AC") ¶ 15.

Plaintiff joined the CIA as a contract covert Operations Officer in 1982, at which time he conducted covert operations against a variety of intelligence targets for the CIA Directorate of Operations ("CIA/DO").[3]  Id. at ¶ 16.  He alleges his service in this role resulted in his eventual approval for promotion to the rank of GS-15 and for receipt of the CIA Special Intelligence Medal.  Id.  He further alleges that he was advised by the CIA that his employment had been converted from that of a contractor to a

---

[2] For purposes of ruling on a motion to dismiss, the factual allegations of the complaint must be presumed true and liberally construed in favor of the plaintiff.  See Shear v. Nat'l Rifle Ass'n of Am., 606 F.2d 1251, 1253 (D.C. Cir. 1979).  Therefore, the facts set forth herein are taken from Plaintiff's Second Amended Complaint or from the undisputed facts presented in the parties' briefs.  Much of the Second Amended Complaint is classified and the CIA has redacted the text accordingly.  The Court cites only to unredacted portions of the Second Amended Complaint.

[3] As Defendants explain, "the Directorate of Operations is a component of the CIA responsible for clandestine collection of foreign intelligence information."  Defs.' Mot. at 4 n.3.

staff employee, and that thereafter he began to receive regular GS promotions and bi-weekly payment stubs.  Id. at ¶ 17.  In 1995, Plaintiff was assigned to the CIA/DO Counter Proliferation Division ("CPD"), where his mission was to collect intelligence on and interdict the proliferation of weapons of mass destruction ("WMD"). Id. at ¶ 18.

Plaintiff alleges that, starting in 2000, he began to receive requests to change his reports or to refrain from reporting certain intelligence.  Id. at ¶ 21.  After the first such instruction, he submitted a complaint via formal CIA "cable channels."  CIA management subsequently advised him that his intelligence report did not support an earlier CIA assessment and told him that if he did not alter his report to support the earlier assessment it would not be received well by the intelligence community.  Id.  Plaintiff refused to alter his report, and the report was not disseminated. Id.

In 2001, Plaintiff met with a "highly respected human asset."[4] Immediately after the meeting Plaintiff reported certain classified information to his supervisor, who in turn met with CPD management. Plaintiff was later instructed to refrain from filing a written report.  He was also told that the Deputy Director of Operations

---

[4] As defined by Defendants, an "asset" is "a human intelligence source who provides information or assistance to the U.S. government, usually in secret, and often at great personal risk and in violation of the laws of nations other than the United States."  Defs.' Mot. at 4 n.4.

("DDO") and CPD Chief would personally brief the President of the United States about the information conveyed by the "asset." Plaintiff claims no such briefing ever occurred.  Id. at ¶ 22.

Plaintiff alleges that the CIA "sequestered intelligence" in this manner on other occasions, as well.  Id. at ¶ 23.

At some point after the requests to alter his reporting began, a co-worker warned Plaintiff that CIA management planned to "get him" for his reporting of intelligence that was contrary to CIA "dogma."  Id. at ¶ 23.  The CPD removed Plaintiff from "handling" at least one asset, and Defendant John Doe No. 1 advised him his promotion to GS-15 and receipt of the Special Intelligence Medal were being withheld until he removed himself from further handling of assets.  Id. at ¶¶ 22, 24.

In 2003, Plaintiff learned that the CIA had initiated a counter-intelligence ("CI") investigation into allegations that Plaintiff had had sex with a female asset.  Five days after beginning a new position at the CIA, he learned that the position was cancelled due to pressure from Defendant Pavitt.  Id. at ¶ 26. In September 2003, the Chief of the CIA Counter Intelligence Center ("CIC") placed Plaintiff on paid administrative leave without explanation, and Defendant Pavitt withheld from Plaintiff the previously approved promotion to GS-15 and the Medal of Intelligence.  Id. at ¶ 27-28.

Around May 2004, the CIA Office of Inspector General ("OIG")

informed Plaintiff that Defendants Pavitt and John Does Nos. 1 & 2
reported that Plaintiff had diverted to his own use money provided
to him for payment to human assets.  The OIG advised Plaintiff it
was investigating these claims.  Id. at ¶ 29.

During the week of July 26, 2004, Plaintiff met with OIG
investigators who requested explanations for a list of financial
items, including one check for $30.00 that predated the CI
investigation.  Plaintiff explained all of the deposits.  Id. at ¶
30.  The OIG again interviewed Plaintiff on December 8, 2004
regarding the alleged diversion of funds.  On April 19, 2005,
Plaintiff received final notification that the OIG investigation
was terminated.[5]  Id. at ¶ 36.  There was no finding of wrongdoing
by Plaintiff.  Id.

On August 6, 2004, while the OIG investigation was ongoing,
the CIA notified Plaintiff that effective September 10, 2004 he
would be terminated for unspecified reasons.  The letter
characterized Plaintiff's position as one of a contractor, and
Plaintiff did not receive the administrative process afforded to
CIA employees prior to termination.  Id. at ¶ 31.

Plaintiff alleges the CI and OIG investigations were a sham
undertaken to discredit him in retaliation for his refusal to
falsify his reports.  Id. at ¶¶ 32-33.  He alleges the information

---

[5] The Second Amended Complaint contains no pleadings regarding
the conclusion of the CI investigation.

collected about him is contained in a system of records retrievable by his name or other identifier, and that these records provided Defendants the necessary pretext to terminate him. <u>Id.</u> at ¶ 34. Plaintiff claims material inaccuracies exist in a number of these records, including his Official Personnel File, Counter-Intelligence Center file, Office of Medical Services file, and his Center for CIA Security file. <u>Id.</u> at ¶ 37.

### B.   Procedural History

Plaintiff filed the instant action on December 6, 2004. On April 27, 2005, he filed an amended complaint; on November 15, 2005, he filed a Second Amended Complaint with leave of the Court. The Second Amended Complaint alleges violation of the APA, 5 U.S.C. §§ 706(1) & (2)(A) - (D); violation of the Privacy Act, 5 U.S.C. §§ 552a(e)(2) & (5); breach of contract pursuant to the Little Tucker Act, 28 U.S.C. § 1346(a)(2); "failure to convert Plaintiff to staff employee"; "tortious violation of Plaintiffs' [sic] rights under the U.S. Constitution and amendments thereto"[6]; and violation of the Federal Tort Claims Act ("FTCA"). Plaintiff seeks injunctive relief to reinstate his CIA employment at the GS-15 staff level and to order the CIA Director to undertake rule-making to promulgate

---

[6] Defendants contend that individual Defendants James Pavitt, John Doe 1 and John Doe 2 have not yet been served with the Second Amended Complaint, and thus are not presently represented by the Government Defendants' counsel. Therefore, the Motion to Dismiss does not address the <u>Bivens</u> claim against the individual Defendants.

regulations to ensure protection of Plaintiff's rights relating to his CIA employment; restitution of back pay; compensatory damages and attorneys' fees as a result of the foregoing.

Defendants filed the present Motion to Dismiss the Second Amended Complaint on December 19, 2005 [Dkt. No. 31], which Plaintiff opposed on March 9, 2006 [Dkt. No. 37] ("Pl.'s Opp'n"). Defendants filed a Reply on April 3, 2006 [Dkt. No. 41] ("Defs.' Reply").

## II. STANDARD OF REVIEW

A motion to dismiss should only be granted "when it appears beyond doubt that, under any reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief." Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984). Because such motions "summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, [they] should be treated with the greatest of care." Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987). Accordingly, the factual allegations of the Complaint must be presumed true and liberally construed in favor of Plaintiff. Shear, 606 F.2d at 1253.

Likewise, in considering a motion to dismiss for lack of subject matter jurisdiction, the Court accepts as true all material factual allegations in the complaint. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Walker v. Jones, 733 F.2d 923, 925-26 (D.C. Cir.

1984).   The plaintiff bears the burden of establishing that the court has jurisdiction.  District of Columbia Retirement Bd. v. United States, 657 F. Supp. 428, 431 (D.D.C. 1987), citing KVOS, Inc. v. Associated Press, 299 U.S. 269 (1936).

**III.  ANALYSIS**

> **A.    The Civil Service Reform Act Precludes Plaintiff's APA (Count I), Contract (Count III), and FTCA (Count VI) Claims; It Does Not Preclude Plaintiff's Privacy Act Claim (Count II)**

As a threshold matter, Defendants contest this Court's subject matter jurisdiction over Plaintiff's APA, Privacy Act, FTCA and contract claims.   They argue that the Civil Service Reform Act ("CSRA") deprives the Court of jurisdiction over these claims because they constitute challenges to personnel decisions, which may only be reviewed pursuant to that statute's remedial scheme.

> **1.   CSRA Background**

The CSRA, enacted in 1978, established an elaborate new framework for evaluating adverse personnel actions against certain categories of federal employees.   The Supreme Court described this framework as "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." United States v. Fausto, 484 U.S. 439, 445 (1988).   It creates procedures for administrative and judicial review of personnel actions for covered employees.   The CSRA provides procedural protections for three general types of

personnel actions: "personnel actions," such as appointments, promotions, disciplinary actions, and decisions concerning pay, benefits or awards, 5 U.S.C. §2302; removals and reductions in grade and pay based on unacceptable performance, 5 U.S.C. § 4303; and "adverse personnel actions" taken to "promote the efficiency of the service" (i.e. involving employee misconduct), such as removals, suspensions, and reductions in grade or pay.  5 U.S.C. §§ 7503, 7513.

Chapter 23 of the CSRA, which establishes the principles of the merit system of employment, "forbids an agency to engage in certain 'prohibited personnel practices,' including unlawful discrimination, coercion of political activity, nepotism, and reprisal against so-called whistleblowers." Fausto, 484 U.S. at 446 (citing 5 U.S.C. § 2302).  Chapter 23 applies to prohibited personnel practices by agency employees with "authority to take, direct others to take, recommend, or approve any personnel action." 5 U.S.C. § 2302(b).  "Personnel action" is defined to include appointments, promotions, disciplinary actions, and decisions concerning pay, benefits or awards, among other actions.  5 U.S.C. § 2302(a)(2)(A).  Employees covered by this chapter are given the right to file charges of prohibited personnel practices with the Office of Special Counsel of the Merit Systems Protection Board ("MSPB"), whose responsibility it is to investigate the charges and, where appropriate, to seek remedial action from the agency and

the MSPB.  5 U.S.C. § 1204.

Chapter 75 of the CSRA governs adverse actions taken against employees for the "efficiency of the service."  Subchapter II, the subchapter relevant to this case, governs major adverse actions taken against covered employees; they are defined as removals, suspensions for more than 14 days, reductions in grade or pay, or furloughs for 30 days or less.  5 U.S.C. §§ 7511-7514.  In each subchapter, covered employees are given certain procedural protections.  In Subchapter II, all employees covered by the statute are accorded administrative review by the MSPB, followed by judicial review in the Federal Circuit.  5 U.S.C. §§ 7513(d), 7703.

It is well-established that the CSRA preempts many other remedies federal civil service employees had prior to its enactment.  In Bush v. Lucas, 462 U.S. 367, 373 (1983), the Supreme Court held that the CSRA precluded an employee's Bivens action, even though the CSRA remedial mechanisms were less complete than the damages remedy provided in Bivens.  The Supreme Court reasoned that it would be inappropriate to supplement the CSRA's "elaborate remedial system" with new judicial remedies for claims "aris[ing] out of an employment relationship."  Id. at 368, 388.  The Court expressly declined to consider whether judicial remedies would be available "in the absence of any other remedy to vindicate the underlying right."  Id. at 378 n.14.

The Supreme Court addressed precisely that question in <u>Fausto</u>, where a federal employee sought judicial review of his removal from government service under the Back Pay Act, 5 U.S.C. § 5596, on the ground that his dismissal violated regulations issued by his employing agency.    <u>Id.</u> at 441-43 & n.2.    The employee's classification gave him no right to administrative or judicial review under the CSRA.    The Supreme Court held that the comprehensive framework of the CSRA nevertheless precluded judicial review under the Back Pay Act:

> The CSRA established a comprehensive system for reviewing personnel action taken against federal employees. Its deliberate exclusion of employees in respondent's service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue here prevents respondent from seeking review ... under the Back Pay Act.

<u>Id.</u> at 455.

The Court reasoned that allowing direct judicial review of employment claims for employees with no rights under the CSRA would provide them a more substantial right to review than was available to employees granted a right to judicial review under the CSRA.  Employees granted a right to judicial review under the CSRA are required to first seek administrative review by the MSPB before proceeding to judicial review in the Federal Circuit.  <u>See</u> <u>id.</u> at 448-50.

The Supreme Court also concluded that when Congress established the elaborate CSRA remedial system, it intended to

streamline the procedures available for review of federal employees' personnel actions. Direct judicial review for non-covered employees would undermine "the development, through the MSPB, of a unitary and consistent Executive Branch position on matters involving personnel action," and would frustrate the congressional intent to "avoid[] an unnecessary layer of judicial review in lower federal courts." Id. at 449 (internal quotation omitted).

The Court found that the CSRA was intended to displace the alternative avenues for review available at that time. Id. at 454-55. Given the comprehensiveness of the CSRA scheme, the Court concluded that Congress' exclusion of employees in the Fausto plaintiff's service category from the provisions establishing administrative and judicial review was intentional and deliberate. Id. at 455. In particular, the Court held that exclusion of a class of employees from the protections of the CSRA does not leave those employees "free to pursue whatever judicial remedies [they] would have had before enactment of the CSRA." Id. at 447. Rather, such exclusion evinced a "clear congressional intent to deny the excluded employees the protections of Chapter 75 - including judicial review - for personnel action covered by that chapter." Id. at 447. Thus, the Court ruled that by expressly excluding members of the Fausto plaintiff's classification from the CSRA's remedial system, Congress intended to prevent them from seeking

judicial review under the Back Pay Act.   Id.

The CSRA expressly excludes CIA employees from the classes of employees for whom the CSRA's review procedures are available.   5 U.S.C. §§ 2302(a)(2)(A), 7511(b)(7).   Defendants, citing Fausto, argue that this exclusion not only prevents Plaintiff from pursuing the remedies provided under the CSRA, but also from pursuing all remedies otherwise available for personnel actions covered by the CSRA.   Defendants contend that because Plaintiff's APA, Privacy Act, contract, and FTCA claims challenge such "personnel actions," they are preempted by the CSRA under Fausto.

**2.  The CSRA Precludes Plaintiff's APA Claim (Count I) Because It Seeks Judicial Review of Adverse Personnel Actions**

Plaintiff brings Count I of the Second Amended Complaint pursuant to the APA, 5 U.S.C. §§ 706(1) & (2)(A)-(D).[7]  He alleges

_____

[7] Administrative Procedure Act 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall -

(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be -
  (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
  (B) contrary to constitutional right, power, privilege, or immunity;
  (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
                                        (continued...)

that Defendants violated the APA through their violation of "portions of CIA regulations providing for the integrity of intelligence collection and reporting." 2AC ¶ 39. He seeks reinstatement at the GS-15 staff level "to which his promotion was wrongfully withheld," as well as restitution of pay at that salary level. Id. at ¶ 41. He also asks the Court to order the CIA "to undertake rule-making to promulgate appropriate regulations to ensure protection of Plaintiff's rights in matters concerning ... his employment at CIA." Id. at ¶ 42.

Plaintiff's APA claim seeks judicial review of the CIA's decision to deny him a promotion and to terminate him.[8] Defendants

_____

(...continued)

        (D) without observance of procedure required by law;
        (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

[8] To the extent Plaintiff claims that the CIA violated its own regulations governing investigation of complaints, resulting in injury to Plaintiff's reputation, he must pursue this claim pursuant to the Privacy Act. "[W]here the Congress has provided special and adequate review procedures," APA Section 704 does not provide additional judicial remedies. Bowen v. Massachusetts, 487 U.S. 879, 903 (1988); see also 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no

-14-

contend that these claims are precluded by the CSRA.[9]  Defs.' Mot. at 25 n.20.  Significantly, Plaintiff's Opposition does not even address Defendants' preclusion argument.  Accordingly, Plaintiff may be deemed to have conceded the Motion to Dismiss as to Count II.  LCvR 7(b); see <u>United States v. Real Property Identified As: Parcel 03179-005R</u>, 287 F. Supp. 2d 45, 61 (D.D.C. 2003) ("If the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded.") (internal citation omitted).  Because the decision to deem an argument as conceded for a party's failure to respond is discretionary, and because Defendants' argument challenges subject matter jurisdiction, the Court will consider, on the merits, whether the APA claim is precluded by the CSRA.

Our Court of Appeals has concluded that the CSRA eliminates the right to judicial review under the APA for adverse actions that fall within the CSRA's scope.  If the courts were to review such actions, "the exhaustive remedial scheme of the CSRA would be

_____

<u>other adequate remedy in a court</u> are subject to judicial review.") (emphasis added).  The Privacy Act provides for the review of claims of reputational harm.  Accordingly, Plaintiff cannot also pursue this claim pursuant to the APA.

[9]  Defendants also contend that Plaintiff insufficiently alleges what regulations were violated, lacks standing to bring his APA claim, and is not entitled to the relief he seeks.  Defs.' Mot. at 18-28; Defs.' Reply at 10-15.  Because the Court concludes that it has no jurisdiction over Plaintiff's APA claim, there is no need to address those arguments.

impermissibly frustrated." <u>Carducci v. Regan</u>, 714 F.2d 171, 174 (D.C. Cir. 1983); <u>see also</u> <u>Harrison v. Bowen</u>, 815 F.2d 1505, 1513 (D.C. Cir. 1987) (the CSRA "had the effect of depriving employees of a right of judicial review under the APA that they probably had prior to enactment of the CSRA.").

The CSRA precludes APA actions challenging personnel decisions, including those concerning promotions and awards, 5 U.S.C. § 2302(a)(2)(A)(ii) & (ix), as well as those challenging adverse actions, including terminations, 5 U.S.C. § 7512(1). <u>See</u> <u>Graham v. Dep't of Justice</u>, No. 02-1231, 2002 U.S. Dist. LEXIS 27419, at *6-8 (D.D.C. Nov. 20, 2002), <u>aff'd sub nom.</u> <u>Graham v.</u> <u>Ashcroft</u>, 03-5025, 2003 U.S. App. LEXIS 16108 (D.C. Cir. Aug. 5, 2003). The CSRA also precludes claims that, in taking a particular adverse personnel action, an agency violated its own regulations. <u>Graham v. Ashcroft</u>, 358 F.3d 931, 935-36 (D.C. Cir. 2004). These are precisely the types of actions Plaintiff challenges in his APA claim.

In an attempt to circumvent the CSRA, Plaintiff argues in his Opposition that he has alleged a violation of constitutional rights actionable under § 706(2)(B). Pl.'s Opp'n at 16. He points to his <u>Bivens</u> claim (Count V) in support of this argument. <u>Id.</u>

It is true that our Court of Appeals has held that federal employees may "seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights";

the CSRA does not preclude such claims.  Spagnola v. Mathis, 859 F.2d 223, 229-30 (D.C. Cir. 1988) (en banc) (rev'd in part on other grounds by Hubbard v. EPA, 982 F.2d 531 (D.C. Cir. 1992).  However, despite two amendments to his original Complaint, Plaintiff's final Second Amended Complaint still does not allege in his APA claim a violation of a constitutional right.  He alleges only that "[t]he complained of acts and omissions by Defendants Goss [sic] have violated [classified] portions of CIA regulations providing for the integrity of intelligence collection and reporting, in violation of 5 U.S.C. §§ 706(1) & (2)(A) - (D)."  2AC ¶ 39 (emphasis added).[10] Alleged violation of agency regulations cannot be reviewed under Graham. 358 F.3d at 935-36.

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's APA claim (Count I) is granted.

**3.    The CSRA Does Not Preclude Plaintiff's Privacy Act Claim (Count II) Because Plaintiff Has Alleged that the Violations Actually Caused His Injury**

In Count II, Plaintiff alleges Defendants violated the Privacy Act, which "regulates the collection, maintenance, use, and

---

[10] Plaintiff argues in his Opposition that his allegations "can also be fairly read at this stage to implicate violations of the National Security Act of 1947, as amended, as well as procedural violations, actionable under §§ 706(2)(C) & (D)."  Pl.'s Opp'n at 16.   Plaintiff's Second Amended Complaint contains no such allegations.   Moreover, to the extent Plaintiff purports to challenge his termination under § 102(c) of the National Security Act, the Supreme Court has held that APA § 701(a)(2) precludes judicial review of terminations under § 102(c) because the decision to terminate a CIA employee is committed to agency discretion by law.  Webster v. Doe, 486 U.S. 592, 601 (1988).

dissemination of information concerning individuals." <u>Cardamone v.
Cohen</u>, 241 F.3d 520, 524 (6th Cir. 2001).   Plaintiff argues that
during the CIA's investigation of his alleged sexual affair and
diversion of funds, the agency willfully and intentionally created
and relied upon inaccurate records in violation of the Privacy Act
and that these violations resulted in irreparable damage to his
career.  He claims that these records caused him injury, including
his termination and "adverse determinations about the rights,
benefits and privileges of Plaintiff under Federal Programs."  2AC
¶ 46.

Specifically, Plaintiff alleges violation of two provisions of
the Privacy Act.  First, he alleges that Defendant CIA "wilfully
and intentionally failed to maintain accurate, timely and complete
records" about him in violation of 5 U.S.C. § 552a(e)(5) ("Accuracy
claim").[11]  2AC ¶ 44.  As a result of this violation, Plaintiff
alleges that he suffered the following adverse determinations: he
was placed on administrative leave, barred from entering CIA
facilities or engaging in any further operations on behalf of the
CIA, denied his "previously approved promotion to GS-15" and the

---

[11] 5 U.S.C. § 552a(e)(5) provides:

Each agency that maintains a system of records shall ...
maintain all records which are used by the agency in
making any determination about any individual with such
accuracy, relevance, timeliness, and completeness as is
reasonably necessary to assure fairness to the individual
in the determination.

CIA Medal of Intelligence, terminated from his employment, and denied the process to which he would have been entitled as a GS staff employee to contest his termination.[12]

Second, he alleges that Defendant CIA violated 5 U.S.C. § 552a(e)(2)[13] by "wilfully and intentionally fail[ing] to the greatest extent practicable to collect directly from Plaintiff information that would have refuted the allegations against him" ("Information-Gathering claim"). 2AC ¶ 46. Plaintiff alleges that this violation "resulted in adverse determinations about [his] rights, benefits and privileges ... under Federal Programs...." Id. For each of these violations, he seeks actual damages and all relief to which he is entitled under the Privacy Act. 2AC ¶¶ 48-49.[14]

---

[12] In his allegation of injury, Plaintiff refers back to ¶¶ 22-29 of the Complaint. 2AC ¶ 44. Because the paragraph numbers of this claim were not changed in Plaintiff's Second Amended Complaint, the Court will liberally construe the cross-referenced paragraphs to which the alleged injury refers to encompass Paragraphs 22-35 of the Second Amended Complaint.

[13] 5 U.S.C. § 552a(e)(2) provides:

Each agency that maintains a system of records shall ... collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs.

[14] In his Opposition, Plaintiff contends for the first time that he has "an equitable right to challenge the offending records" and seek expungement. Pl.'s Opp'n at 13-14. To the extent Plaintiff is asserting this "equitable right" as a constitutional claim rather than as a statutory claim, the case law is clear that

In assessing whether the CSRA precludes these claims, the determinative question is whether they fall within its purview. See, e.g., National Treasury Employees Union v. Devine, 577 F. Supp. 738, 745 (D.D.C. 1983), aff'd 733 F.2d 114 (D.C. Cir. 1984). As discussed above, this statutory framework covers "personnel actions," including promotions, benefits and awards, as well as adverse actions, including terminations. See 5 U.S.C. §§ 2302(a)(2)(A)(ii) & (ix), 7512(1). Where a plaintiff's Privacy Act claim in substance seeks judicial review of such a federal personnel action, as Defendants argue here, the CSRA precludes that claim regardless of how Plaintiff seeks to characterize it. See Kleiman v. Dep't of Energy, 956 F.2d 335, 338 (D.C. Cir. 1992).

Plaintiff argues that his Privacy Act claims are outside the CSRA scheme and therefore not precluded by it. He contends that

---

"when a constitutional claim is intertwined with a statutory one, and Congress has provided machinery for the resolution of the latter, a plaintiff must first pursue the administrative machinery." Steadman v. Governor, United States Soldiers' & Airmen's Home, 918 F.2d 963, 967 (D.C. Cir. 1990). He has not done so here. As Defendants correctly point out, Plaintiff has failed to plead that he sought expungement pursuant to the amendment provisions of 5 U.S.C. § 552a(d)(2) & (3) administratively before seeking judicial review. Defs.' Reply at 9 n.7. See 5 U.S.C. § 552a(d); Dickson v. Office of Personnel Mgt., 828 F.2d 32, 40-41 (D.C. Cir. 1987). Accordingly, he has failed to plead exhaustion of his administrative remedies as to this claim. Plaintiff cannot circumvent the exhaustion requirement by styling his "equitable right" as a constitutional claim where, as here, Congress has provided administrative machinery for the resolution of the statutory claim. Because he has not alleged exhaustion of available administrative remedies, this Court has no authority to consider Plaintiff's alleged equitable right to challenge the records.

these claims do not arise out of one of the prohibited personnel actions specifically enumerated by the CSRA, but rather arise out of the recording of inaccurate information during the course of the two "sham investigations" that discredited him.  Pl.'s Opp'n at 12-13.   Moreover, Plaintiff argues that because his injuries were actually caused by this inaccurate information, his claims are not precluded by the CSRA.  Pl.'s Opp'n at 13.

A  Privacy  Act  claim  survives  CSRA  preclusion  in  this jurisdiction if a plaintiff shows the harm alleged was <u>actually caused</u> by the alleged violation.  In <u>Hubbard v. EPA</u>, 809 F.2d 1, 5 (D.C. Cir. 1986) <u>aff'd in part on other grounds sub nom.</u> <u>Spagnola v. Mathis</u>, 859 F.2d 223 (D.C. Cir. 1988) (en banc), our Court of Appeals explained that while the CSRA preempts judicial review of prohibited  personnel  actions,  the  District  Courts  retain jurisdiction to award damages "for an adverse personnel action actually caused by an inaccurate or incomplete record."  <u>See also</u>, <u>Kleiman</u>, 956 F.2d at 339 n.5 (reaffirming <u>Hubbard</u>'s statement that "the Privacy Act permits a federal job applicant to recover damages for an adverse personnel action actually caused by an inaccurate or incomplete record").   The question before this Court, then, is whether Plaintiff has sufficiently alleged that the adverse actions were caused by the inaccurate records.

In their  argument  on  the  merits,  Defendants  contend  that Plaintiff has not properly alleged causation in either his Accuracy

or Information-Gathering claims.    Rather, they argue he has specifically alleged that his termination was in retaliation for his failure to falsify his intelligence reporting.    Accordingly, Defendants argue, the two investigations that are the subject of Plaintiff's Privacy Act claims cannot also be the cause of his termination for purposes of the Privacy Act. Defs.' Mot. at 13-15.

With respect to his Accuracy claim, Plaintiff counters that the announced basis for his termination was the false information contained in the identified files.    He contends that the CIA initiated two investigations, and that the inaccurate information recorded during those investigations proximately caused the CIA to order his termination.

The fact that Plaintiff also claims that the investigations themselves were pretextual does not preclude his causation argument.    See Pl.'s Opp'n at 9-11.    Under Federal Rule of Civil Procedure 8(e)(2), a plaintiff may plead inconsistent facts in support of alternative theories of recovery.    At this stage in the proceedings, Plaintiff may argue that the investigations were a pretext used to terminate him for refusing to falsify his reports and at the same time argue that the investigations actually caused his termination.    Discovery may show that Plaintiff was, in fact, terminated due to the allegedly false information in his records

collected as part of the CI and OIG investigations.[15]

Moreover, in <u>Krieger v. Fadely</u>, 211 F.3d 134, 136 (D.C. Cir. 2000), the Court of Appeals recognized that at the initial pleading stage, very little is required to survive a motion to dismiss for failure to state a claim.  That principle is particularly relevant here where Plaintiff does not even know the precise contents of his records because they are classified and he has no access to them. Thus, his allegation is plausible that these records contain derogatory information that formed the pretext for his termination. For example, he knows that the CIA initiated two investigations and he knows he was subsequently fired.  It is not unreasonable to conclude, as Plaintiff has alleged, that information recorded in his files as a result of the investigations was the cause of his termination.  Reading the Complaint in the light most favorable to Plaintiff, he has alleged actual causation in his Accuracy claim. Accordingly, that claim is not precluded by the CSRA.

With respect to his Information-Gathering claim, Plaintiff has alleged that Defendants' failure to seek information from him in

_____

[15] There is no dispute that the OIG investigation was concluded with no finding of wrongdoing on Plaintiff's behalf, that the CIA sought information from Plaintiff in July 2004, or that the investigation did not conclude until April 2005, after Plaintiff's termination.  <u>See</u> 2AC ¶¶ 30, 36; Defs.' Reply at 5.  This timing does not necessitate a finding against causation, however.  The extent to which various pieces of information collected during the course of the investigation itself affected the adverse actions in this case is an issue of fact that cannot be resolved at this stage.

the course of the CI investigation, and the failure to seek information at an earlier point in the OIG investigation, proximately caused adverse determinations about his rights and benefits under federal programs.  It is true that Plaintiff does not provide much detail regarding the determinations about his rights and benefits or about the role of the CI and OIG investigation reports in those determinations.  However, "complaints 'need not plead law or match facts to every element of a legal theory.'" Krieger, 211 F.3d at 136 (internal citation omitted).

Moreover, the Court at this early stage must give Plaintiff "the benefit of all inferences that plausibly can be drawn from well-pleaded allegations of the complaint," Haynesworth, 820 F.2d at 1254.  It is certainly plausible to infer from Plaintiff's allegations that, had Defendants consulted with him regarding the CI investigation, the allegedly false information would not have been recorded in Plaintiff's files.  Similarly, the Court may plausibly infer that, had Defendants consulted with Plaintiff at an earlier point in the OIG investigation, certain false or inaccurate information would not have been recorded in Plaintiff's files.

Because Plaintiff has alleged that Defendants Privacy Act violation actually caused his injury, the Information-Gathering claim is not precluded by the CSRA.

**4.    The CSRA Precludes Plaintiff's Contract Claim (Count III) Because It Seeks Judicial Review of Adverse Personnel**

**Actions**

In Count III of the Second Amended Complaint, Plaintiff alleges that "Defendants have acted in a wrongful and illegal manner in terminating [Plaintiff's contract of employment], as the result of which Plaintiff has suffered damages." 2AC ¶ 51. He contends that "Defendants' complained of actions constitute breach of Plaintiff's contract of employment, including the implied covenant of good faith and fair dealing." Id. Defendants argue that Plaintiff was properly terminated as a contract employee, and that his contract claim is an improper attempt to circumvent the CSRA.

Plaintiff's contract claim challenges his termination. This is a quintessential adverse personnel action covered by the CSRA. As with Plaintiff's APA claim, the Court has no jurisdiction to consider a breach of contract claim arising out of a personnel action. See Bobula v. United States Dep't of Justice, 970 F.2d 854, 857-58 (Fed. Cir. 1992).[16] For these reasons, Plaintiff's contract claim is dismissed.

---

[16] Plaintiff brings his breach of contract claim pursuant to the Little Tucker Act, which waives sovereign immunity for certain types of damage claims, including "any express or implied contract with the United States," not exceeding $10,000. 28 U.S.C. § 1346(a)(2). As Defendants point out, while this Court may hear claims under the Little Tucker Act, such claims may only be appealed to the Federal Circuit. See 28 U.S.C. § 1295(a)(2); Kline v. Cisneros, 76 F.3d 1236 (D.C. Cir. 1996). As such, Federal Circuit precedent regarding the Little Tucker Act is binding on this Court.

5.   **The CSRA Precludes Plaintiff's Federal Tort Claims Act Claim (Count VI) Because It Seeks Judicial Review of Adverse Personnel Actions**

Plaintiff's FTCA claim against "Defendant United States" alleges that Defendant "negligently failed to convert Plaintiff's employment status from that of a contractor to that of a staff employee of CIA...." 2AC ¶ 61. He claims Defendants breached a "duty to properly administer and manage his personnel records," Pl.'s Opp'n at 26, which resulted in the failure to process his alleged promotion. His allegations amount to a complaint of negligence for failure to promote him to an agency employee position.

The promotion of a federal employee falls squarely within the CSRA's definition of "personnel action." 5 U.S.C. § 2302(a)(2)(A)(ii). As discussed above, the case law is clear that Congress intended to preclude non-CSRA remedies for such actions, even where the CSRA does not make those remedies available to the plaintiff. Our Court of Appeals has held that this preclusion applies to federal employees' FTCA claims. See Am. Postal Workers Union, AFL-CIO v. United States Postal Serv., 940 F.2d 704, 708-09 (D.C. Cir. 1991) (holding that the CSRA preempted FTCA claim even where plaintiffs did not have access to remedies provided to other classes of employees under the CSRA).[17]

---

[17] Plaintiff failed to respond to Defendants' argument that the FTCA claim is precluded by the CSRA. Consequently, as noted earlier, this Court may deem that argument conceded. LCvR 7(b);

For these reasons, Plaintiff's FTCA claim is dismissed.

**B.   Defendants' Motion to Dismiss the Privacy Act Claim (Count II) Is Denied Because Plaintiff Has Sufficiently Pled Each Element of His Accuracy Claim and His Information-Gathering Claim**

**1.   Plaintiff Has Sufficiently Pled the Elements of His Accuracy Claim**

The Privacy Act requires that each agency that keeps a system of records must maintain those records "with such accuracy, relevance, timeliness, and completeness as is reasonably necessary" to assure fairness to an individual. 5 U.S.C. § 552a(e)(5). See Sellers v. Bureau of Prisons, 959 F.2d 307, 312 (D.C. Cir. 1992) ("As long as the information contained in an agency's files is capable of being verified, then, under sections (e)(5) and (g)(1)(C) of the Act, the agency must take reasonable steps to maintain the accuracy of the information to assure fairness to the individual.").

To make out a claim for money damages under this section of the Privacy Act,[18] a plaintiff must demonstrate that (1) he has been aggrieved by an adverse determination, (2) the CIA has failed to

---

see Real Property Identified As: Parcel 03179-005R, 287 F. Supp. 2d at 61.

[18] Plaintiff states in his Opposition that he seeks to clear his reputation through his Privacy Act claim. Pl.'s Opp'n at 12 n.13. To the extent that by this argument Plaintiff means he seeks the remedy of expungement, he has no such remedy through his Privacy Act claim because he has not alleged exhaustion of his administrative remedies. See supra Section III.A.3. n.14; M.K. v. Tenet, 99 F. Supp.2d 12 (D.D.C. 2000) (citing Nagel v. HEW, 725 F.2d 1438, 1441 (D.C. Cir. 1984)).

maintain his records with the degree of accuracy necessary to assure fairness in that determination, (3) the CIA's reliance on the inaccurate records was the proximate cause of the adverse determination, and (4) the CIA acted willfully and intentionally in failing to maintain accurate records.  See Deters v. U.S. Parole Comm'n, 85 F.3d 655, 657 (D.C. Cir. 1996).

If an agency willfully or intentionally fails to maintain records in such a manner and, as a result, makes a determination adverse to an individual, it will be liable to that person for money damages.  5 U.S.C. §§ 552a(g)(1)(C) & (g)(4).  See Sellers, 959 F.2d at 312.  An agency acts in an intentional or willful manner "either by committing the act without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act.  The violation must be so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." Deters v. U.S. Parole Comm'n, 85 F.3d 655, 660 (D.C. Cir. 1996) (internal citations omitted); see Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987) (agency must act "with something greater than gross negligence").

In addition to their challenge to Plaintiff's allegations of causation, which the Court addressed in the context of the CSRA, supra,[19] Defendants raise two further arguments against Plaintiff's

---

[19] The discussion of CSRA preclusion addressed this same causation question raised on the merits of the Privacy Act claim – whether Plaintiff has sufficiently alleged that his injury was

Accuracy claim.

First, Defendants contend that Plaintiff has not adequately identified the records he alleges are inaccurate. Defs.' Mot. at 6-8. Plaintiff responds that he has identified particular files containing inaccurate records, which he contends is adequate to put Defendants on notice as to his Accuracy claim.

The Federal Rules of Civil Procedure require that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed. R. Civ. P. 8(a)(2). The complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

In the Second Amended Complaint, Plaintiff alleges that "intentional, material inaccuracies exist in his Official Personnel File, Counter-Intelligence [sic] Center file, Office of Medical Services file, Center for CIA Security file, and other CIA files." 2AC ¶ 37. His pleadings clearly allege that the inaccuracies relate to the OIG and CI investigations: "[T]he information about him gathered during the course of the CI and OIG investigations is contained in records stored in a system of records, retrievable by his name or other identifier." Id. at ¶ 34.

---

actually caused by the Privacy Act violations. As discussed supra, Plaintiff's causation allegations are sufficient to survive a motion to dismiss.

Thus, it is clear that Plaintiff has identified the files containing the inaccurate records, as well as the general subject matter of the records.  These allegations are sufficient to withstand a motion to dismiss.  See Krieger, 211 F.3d at 136 ("If his lawsuit went forward, there would come a time when [the plaintiff] would have to identify the particular records [the defendant] unlawfully disclosed [under the Privacy Act].  But that point surely was not as early as the pleading stage."); M.K., 99 F. Supp. 2d at 21-22.

Second, Defendants argue that Plaintiff "has failed to adequately allege wilfulness or intentionality, as required by the Privacy Act."   Defs.' Reply at 4-5.   Because Plaintiff's allegations merely parrot the language of the Privacy Act, Defendants contend, they are conclusory and cannot withstand a motion to dismiss.  Id.  Plaintiff counters that the allegations in the Second Amended Complaint sufficiently plead willful or intentional conduct.

In the Second Amended Complaint, Plaintiff alleges that the CIA initiated two sham investigations "for the sole purpose of discrediting him and retaliating against him" for refusing to falsify his intelligence reporting.  2AC ¶ 33.  He alleges that the information gathered during the course of these investigations is contained in the files he identifies.   Id. at ¶ 34.   If proven, Defendants' calculated recording of false information pursuant to

-30-

these allegedly sham investigations would certainly meet <u>Deters</u>'
definition of a willful or intentional conduct.  <u>See</u> <u>Toolasprashad
v. Bureau of Prisons</u>, 286 F.3d 576, 583-84 (D.C. Cir. 2002)
(finding the defendants acted willfully or intentionally when they
"fabricated and falsified" a transfer memorandum to punish the
plaintiff for, among other things, filing administrative
grievances).

    For these reasons, Defendants' Motion to Dismiss is denied
with respect to Plaintiff's Accuracy claim.

### 2.   Plaintiff Has Sufficiently Pled the Elements of His Information-Gathering Claim

    In his Information-Gathering claim, Plaintiff alleges that
Defendant CIA violated 5 U.S.C. § 552a(e)(2) by "wilfully and
intentionally fail[ing] to the greatest extent practicable to
collect directly from Plaintiff information that would have refuted
the allegations against him."  2AC ¶ 46.  A plaintiff seeking
relief under subsection (e)(2) of the Privacy Act must show that
(1) the agency failed to elicit information directly from him to
"the greatest extent practicable," (2) the violation was
"intentional or willful," and (3) this action had an adverse effect
on the plaintiff.  <u>Waters v. Thornburgh</u>, 888 F.2d 870, 872 (D.C.
Cir. 1989), <u>abrogated on other grounds by</u> <u>Doe v. Chao</u>, 540 U.S. 614
(2004).

    Defendants argue that the Information-Gathering claim related
to the OIG investigation must be dismissed because Defendants did,

in fact, gather information from Plaintiff during this information, albeit after some delay. Defs.' Mot. at 9. Defendants contend that the Privacy Act allows an agency to approach a target at the end of an investigation, if at all, when circumstances render a different approach impracticable. In the context of the investigation of a theft, where the subject's credibility is in question, the delay in consulting with Plaintiff is entirely reasonable. Because the Second Amended Complaint fails to allege that it was practical to approach Plaintiff earlier in the investigation, Defendants argue, Count I must be dismissed as to the OIG Information-Gathering claim.

Plaintiff responds that an earlier attempt to obtain information from him would have resulted in an earlier favorable resolution of this investigation. He further contends that there is no basis to believe he attempted to influence witnesses or interfere with the OIG investigation, and that Defendants' arguments regarding this issue are factual speculations that are inappropriate in a motion to dismiss. Pl.'s Opp'n at 5-6.

Defendants' own arguments underscore the disputed factual nature of this issue. Each of the cases Defendants cite in support of their argument arose in a post-discovery summary judgment or final judgment posture. For example, in Carton v. Reno, 310 F.3d 108, 111-12 (2d Cir. 2002)(internal citation omitted)(emphasis added), the Second Circuit pointed out that the "specific nature of

each case shapes the practical considerations at stake that determine whether an agency has fulfilled its obligation." Whether the delay in this case was "reasonable," and whether Defendants actually gathered information from Plaintiff "to the greatest extent practicable" is, in this case, a disputed factual issue that cannot be decided at this early stage in the proceedings.

Defendants raise similar arguments regarding Plaintiff's claim that they failed to properly gather information from him during the CI investigation.  Defs.' Mot. at 10-13.  First, Defendants argue that Plaintiff has failed to allege that during this investigation Defendants could have gathered more information from him than they did.  Id. at 10.  Plaintiff responds that he "has never been interviewed as part of the CI investigation.  Thus, Defendants have gathered no information from [Plaintiff], despite the fact that he could provide the very type of objective information to resolve this issue...."  Pl.'s Opp'n at 7 (emphasis in original). Defendants concede that the CIA failed to speak directly with Plaintiff during the CI investigation.  See Defs.' Mot. at 13; Defs.' Reply at 6.  When considered with Plaintiff's allegation that Defendants "failed to the greatest extent practicable to collect [information] directly from Plaintiff," this is sufficient to put Defendants on notice as to the nature of Plaintiff's Information-Gathering claim.

Second, Defendants argue that they could not, in fact, have

practicably gathered information directly from Plaintiff during the CI investigation.  The failure to consult with Plaintiff regarding this investigation is excusable, Defendants contend, because there is no absolute requirement that an agency gather information from the subject of an investigation where the subject is in a position to intimidate third parties or encourage collusion.  Given Plaintiff's position as a CIA officer, he had considerable power over the "asset" with whom he allegedly had a sexual relationship. Defendants further emphasize the importance of protecting CIA sources and methods, and the agency's concern that a requirement to speak at an early point in the investigation with its target could compromise those sources or methods.

While Defendants' arguments are not without their appeal, they suffer from the same flaws as the arguments relating to the OIG investigation.  Whether Plaintiff was in a position to coerce the "asset" in question, and whether this was a concern that motivated investigators to avoid gathering information from him, are questions of fact not appropriate for resolution at this stage.

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's Privacy Act claim is denied.

### C.   Plaintiff's Failure to Convert Claim (Count IV) Is Dismissed Because It Has No Legal Basis

Count IV purports to state a claim for Defendants' "failure to convert" his status from contract employee to staff employee. Defendants argue that contract employees have no right to such

status conversion, and that Plaintiff's subjective and mistaken belief that he was promoted does not create any legal entitlement to the promotion.  Defs.' Mot. at 33-34.  Moreover, Defendants argue that the claim is precluded because the United States has not waived sovereign immunity.  Id. at 34.  In his Opposition, Plaintiff invokes both contract and fraud principles in a confusing response to Defendants' arguments.  Pl.'s Opp'n at 28-29.

There is no legal basis for a claim of "failure to convert." To the extent this claim is part of Plaintiff's contract or FTCA claims, as Plaintiff appears to argue, it is subsumed within those counts and must be dismissed for lack of jurisdiction.

To the extent this claim purports to allege a separate breach of contract for failure to abide by an alleged agreement to convert Plaintiff to an agency employee, it must fail on two grounds.[20] First, such a contract claim amounts to yet another attempt to seek judicial review of an adverse personnel action and is preempted by the CSRA.  See Bobula, 970 F.2d at 857.  Second, federal employment is governed by federal personnel law and not common law contract principles.  Accordingly, federal employees' employment relationships are governed by Congressional statute and federal

---

[20] In his Opposition, Plaintiff contends for the first time that he relied upon Defendants' representations to him that he had been converted to a staff employee.  Pl.'s Opp'n at 28.  This allegation is nowhere contained in Plaintiff's Second Amended Complaint.  To the extent that Plaintiff is attempting to raise a promissory estoppel claim, he cannot do so for the first time in his Opposition to Defendants' Motion to Dismiss.

case law, not common law contract law.  OCONUS DOD Emple. Rotation
Action Group v. Cohen, 144 F. Supp. 2d 1, 8 (D.D.C. 2000) (citing
Bell v. United States, 366 U.S. 393, 401 (1961); Kizas v. Webster,
707 F.2d 524, 535 (D.C. Cir. 1983); Kania v. United States, 650
F.2d 264, 268 (Ct. Cl. 1981)).

Plaintiff's argument that he "has a colorable claim for ...
misrepresentation," Pl.'s Opp'n at 28, is similarly unavailing.
Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead
misrepresentation with particularity, including (1) the time,
place, and contents of alleged misrepresentations; (2) the identity
of the person who made the misrepresentation; and (3) the method by
which the misrepresentation was made to the plaintiff.  See United
States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 551-52
(D.C. Cir. 2002).  Plaintiff's Second Amended Complaint contains no
such specificity.  In his "failure to convert" claim, Plaintiff
alleges that "Defendants apparently failed to convert Plaintiff to
the status of a staff employee to which Plaintiff was entitled."
2AC ¶ 53.  This allegation contains none of the particularities
required to plead misrepresentation under Rule 9(b).  Moreover, as
Defendants point out in the context of the FTCA claim,
misrepresentation suits are exempt from the FTCA's waiver of
sovereign immunity under the "intentional tort" exception.  Defs.'
Mot. at 29; see 28 U.S.C. § 2680(h).

For these reasons, Plaintiffs "failure to convert" claim is

dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **granted in part** and **denied in part.**

The following counts remain in this case: Count II (Privacy Act claim) and Count V (<u>Bivens</u> claim).

An Order will issue with this Memorandum Opinion.


January 12, 2007                    <u>/s/_____</u>
                                    Gladys Kessler
                                    United States District Judge


<u>**Copies to**</u>**: attorneys on record via ECF**

-37-